**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Teodulo DIAZ-RODRIGUEZ, Defendant-Appellant (two cases).**

**Nos. 72-2436, 72-2624.**

United States Court of Appeals, Ninth Circuit.

April 26, 1973.

Certiorari Dismissed June 19, 1973. See 93 S.Ct. 3024.

Joseph Milchen (argued) McInerney, Milchen & Frank, San Diego, Cal., for defendant-appellant.

Matthew T. Kissane, Asst. U. S. Atty. (argued), Harry D. Steward, U. S. Atty., Douglas G. Hendricks, Stephen G. Nelson, Asst. U. S. Attys., San Deigo, Cal., for plaintiff-appellee.

Before CHAMBERS and BARNES, Circuit Judges, and LUCAS, District Judge.

PER CURIAM:

These appeals are from Diaz' conviction of one count of conspiracy to violate the immigration laws, under 18 U.S.C. § 371 and 8 U.S.C. § 1324, and of twenty-two substantive counts of harboring aliens illegally, under 8 U.S.C. § 1324(a)(3), and from the district court's denial of his motion for a new trial subsequent to those convictions.

The Government alleged a conspiracy to introduce aliens unlawfully into the United States, and to harbor them at Diaz' place of residence in San Diego preparatory to further transportation of the aliens to the Los Angeles area. The evidence adduced, which was directly contradicted in part at trial, demonstrated that Diaz participated in the harboring of the unlawfully admitted aliens at his residence on April 14–15, 1972 under a prior agreement made with three co-conspirators.

The sole issue on appeal as to the merits of the judgment of conviction is whether the district court erred in commenting on the evidence while instructing the jury. A Federal court judge has full discretionary power to offer observations on the evidence during instructions if it is clearly demonstrated that the jury has the exclusive function of making the final finding as to the facts. *See* Duke v. United States, 255 F.2d 721, 728 (9th Cir., 1958); cert. denied 357 U.S. 920, 78 S.Ct. 1361, 2 L.Ed.2d 1365 (1958); Jones v. United States, 124 U. S.App.D.C. 83, 361 F.2d 537, 540 (1966); rehear. denied en banc (1966). Diaz isolates the district court's comments pertaining to the evidence submitted supporting the existence of the conspiracy, and the overt act of the rented truck delivering the aliens to his residence. This isolation of these comments apart from the complete record of instruction is not an accurate interpretation of the scope and overall tenor of the district court's communications to the jury. The district court deemed it to be its duty to focus in its comments and instructions upon the one element of the Government's case which seemed to ˙be based on contradictory testimony and to be located at the center of the factual controversy—Diaz' knowledge of the conspiracy and of the substantive violations. Any emphasis made upon those two elements in the instructions was more than compensated for by the subsequent and final admonition to the jury that it should disregard and reject the district court's preliminary analysis of the evidence in the course of their deliberations. Thus, viewed on the whole, there is no indication that the district court abused its discretion, or otherwise

sought to usurp the jury's function as the ultimate finder of the facts.

With respect to the post-trial motion before the district court, Diaz raises two intimately related issues for ·consideration. He alleges that newly discovered evidence in the form of a pretrial statement by a co-conspirator, undisclosed by the Government prior to and during the trial, necessitated a retrial, and that, alternatively, this statement was not merely cumulative or impeachment evidence, but bore directly upon the question of guilt or innocence and therefore necessitated a retrial. The substance of the statement was that, on the dates in question, the co-conspirator, Mireles, did not either see Diaz, or converse with him on the telephone as to their purported plans to transport the aliens.[1] At trial, Diaz' counsel was finally notified that Mireles would not be called as a witness. His trial counsel never made any request as to any statements the co-conspirator might have made to the Government. After the trial, Diaz' counsel learned for the first time, through a third party, of the ·co-conspirator's statements. A subsequent interview with Mireles by Diaz' counsel corroborated this statement as to the absence of involvement on the part of Diaz in the activities on the dates in question.

The standard for review of an order denying a motion for a new trial on the ground of newly discovered evidence is very narrow.

" 'The generally held essentials for a new trial based on newly discovered evidence are the following: (1) the evidence must have been discovered since the trial; (2) it must be material to the factual issues at the trial, and not merely cumulative nor impeaching the character or credit of a witness; (3) it must be of such a nature that it would probably produce a different verdict in the event of a retrial. United States v. Costello, 255 F.2d 876 (2 Cir.), cert. denied 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958).' " United States v. Durgin, 444 F.2d 308, 308–309 (9th Cir., 1971); cert. denied 404 U.S. 945, 92 S.Ct. 297, 30 L.Ed.2d 260 (1971) quoting United States v. Polisi, 416 F.2d 573, 576–577 (2nd Cir., 1969).

Exceptions to this general rule exist. The Government may not suppress evidence of an exculpatory or of an otherwise favorable nature where it is material to the issue of guilt, irrespective of the good faith of the prosecution. Brady v. State of Maryland, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A test has been phrased whether the undisclosed evidence was so critical that its absence prevented the defendant from receiving a fair trial under the Constitution. United States v.

1. The district court made substantially the following findings of facts as to the controversial statement made by Mireles. In an interview with the Government's attorney, Mireles said that he had met a man called "Shorty" in Mexico who told him that he would be paid $200.00 to assist in an alien smuggling and transportation operation. Mireles had agreed, and Shorty had referred him and Danner, another co-conspirator, to Diaz. Mireles then went to Diaz' residence, and identified himself as being sent by Shorty. Mireles said that Diaz was to be paid $30.00 for renting the house to be used for the alien smuggling operation. Mireles denied knowledge of how the aliens were guided across the border and brought to Diaz' house, and yet he admitted participation in one prior trip with Danner involving the transportation of nineteen aliens to the Los Angeles area. He finally admitted that he only rented the truck for the occasion in question, and was not going to receive any profit from that particular venture. He said that Danner drove the transport vehicle, Shorty arranged the overall operation, and Diaz provided the house for harboring the aliens—and that all he actually did was rent the truck. Mireles then said that he had not seen Diaz on the afternoon of April 14, 1972, and he denied having made any phone calls to Danner or Diaz on April 15, 1972. Mireles was willing to testify against Diaz, but the Government's attorney told him and his counsel that he would not be used as a Government witness. Diaz' trial attorney was never advised of this conversation with Mireles.

Hibler, 463 F.2d 455, 459 (9th Cir., 1972). But materiality—the existence of prejudice—is essential. A new trial is not automatically required whenever the prosecution's files subsequently reveals evidence of possible utility to the defense but of unlikely weight in altering the verdict. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Diaz concedes that it would have been improper to have Mireles take the stand in any event—thus, a substantial question of the utility of the pretrial statement exists. More importantly, however, there was independent evidence tending to corroborate Danner's story[2] as to Diaz' complicity—Diaz' next-door neighbor observed the same various activities in and about the residence on the day in question.[3] *Cf. Giglio, supra,* 405 U.S. at 154–155, 92 S.Ct. 763; *Hibler, supra* 463 F.2d at 458. Accordingly, Diaz' argument for a new trial based not only upon the disclosure of new evidence, but upon the Government's failure to disclose evidence of an exculpatory nature must fail. Since its conceded tendency was to implicate Diaz at least as to the conspiracy charge, its utility did not directly bear solely upon the question of guilt as to the substantive offense—thus, its purpose would more likely have been for limited impeachment purposes. Also, the neighbor's independent testimony corroborating that of Danner's as to Diaz' complicity in the events on the dates in question distinguishes the facts and holdings in *Giglio* and *Hibler.* Accordingly, this Court cannot conclude that the admission of Mireles' statements, even if that had been possible under the circumstances, would have been more likely to result in a different verdict in the event of retrial.

The judgment of conviction and the order denying the motion for a new trial are affirmed.

2. Danner testified to his arrest on April 15, 1972, while driving a rented truck carrying twenty-two aliens. He said that he had met Mireles in Tijuana, Mexico on April 14, and had agreed to drive the rented truck to a place in Orange County, California. Danner and Mireles then drove to Diaz' residence where Mireles talked with Diaz. Mireles then told Danner that he was to pick up the aliens, and bring them back to the house. Danner drove the aliens across the border, with Mireles following in a separate vehicle. Danner then concealed the aliens in a shack at the rear of Diaz' house. The next morning, on April 15, Diaz told Danner that Mireles had called him on the phone, and had advised him to wait until the highway checkpoint was more favorable for moving the aliens north. Subsequently, Mireles called and talked to Danner, advising him that the road was clear. Danner also testified to harboring aliens at Diaz' house the previous week. On April 7, he had driven thirty-five aliens to the house where they stayed overnight before continuing on the next day.

3. The neighbor testified to seeing a rented truck in Diaz' backyard on April 15 and at several times the previous week. He also testified to seeing several individuals who looked like Mexicans being loaded into a truck that day from the small building in Diaz' backyard.