UNITED STATES of America,
Plaintiff–Appellee,

v.

Roger S. BASKES, Defendant–Appellant.

No. 77-2178.

United States Court of Appeals,
Seventh Circuit.

Argued April 28, 1978.
Decided Sept. 18, 1980.

---

472

Harvey M. Silets; Theodore A. Sinars, Harris, Burman, Sinars & Jigant:, Chicago, Ill., for defendant–appellant.

Sam L. Strother, Tax Division, Dept. of Justice, Washington, D. C., for plaintiff–appellee.

Before FAIRCHILD, Chief Judge, MARKEY, Chief Judge,* and BAUER, Circuit Judge.

FAIRCHILD, Chief Judge.

Defendant–appellant Roger S. Baskes was charged in a one–count indictment with conspiring with others to defraud the United States by impeding and obstructing the assessment and collection of income and gift taxes by the Internal Revenue Service. After a jury trial, defendant was found guilty. Kanter, who was tried with Baskes, was acquitted. The cases of other defendants were severed. Following a post–trial denial of the defendant's motion to dismiss the indictment or suppress allegedly illegally acquired evidence, defendant was sentenced to the custody of the Attorney General for a period of two years. This appeal followed. For the reasons hereinafter stated, we affirm.

## I. *Background*

During late 1968 and 1969, Samuel Zell, a real estate investor, entered into negotiations for the purchase of the Arlington Towers, a twenty–two story office–apartment complex, and the adjacent Arlington Plaza, an eleven–story hotel built on top of a six–story garage. The Towers and the Plaza are located in Reno, Nevada. The Towers was owned by a partnership whose partners were John and Margery Cavanaugh (90%), their son John E. Cavanaugh, Jr. (5%), and Barbara and William Thornton, their daughter and son–in–law (5%). The garage and the Plaza were owned entirely by John and Margery Cavanaugh. While these negotiations were taking place, Zell was in repeated contact with his brother–in–law, Roger Baskes, a Chicago attorney specializing in federal income taxation and real estate planning. Zell advised the Cavanaughs that the tax ramifications of any sale could be handled by defendant Baskes' law firm. The parties then devised a highly complicated transaction which they

* The Honorable Howard T. Markey, Chief Judge of the United States Court of Customs and Patent Appeals, is sitting by designation.

claim would legitimately minimize the tax consequences of any sale as well as provide the Cavanaughs with a certain amount of cash after taxes.

Under the terms of the transaction structured by the defendant Baskes, $700,000 which was allegedly part of the purchase price for the Towers and the Plaza was treated as the ultimate purchase price of a third asset owned by the Cavanaughs, the Hornet No. 2, a gold mining claim in the Manhattan, Nevada mining district. The parties, in August 1969, orally agreed to a plan whereby the Towers, the Plaza and the mining claim would be sold. A letter memorializing the prior oral agreement between Zell and Cavanaugh was prepared in November, 1969.

Pursuant to the plan, John Cavanaugh transferred the mining claim to Jeffrey Investment Company (Jeffrey) in exchange for all its preferred stock. Jeffrey was a shelf Nevada corporation already formed by Baskes' law firm. The common stock of Jeffrey was issued to Castle Trust Company, Ltd., Nassau, Bahamas, as Trustee of T–5088, the foreign trust held for the benefit of Cavanaughs' children. On liquidation of Jeffrey, in January 1970, Cavanaugh, Sr. would receive $10,000 in exchange for its preferred stock with ownership of the mining claim going to the foreign trust as common stockholder. In February, Zell, the buyer, deposited the $700,000 in T–5088 and the mining claim was then transferred to Zeno, N.V., a foreign affiliate of Castle Trust Co.[1] The claim was then transferred to Hornet Mining, Inc., a newly formed corporation, in exchange for its stock. The Hornet Mining stock was then sold to a partnership called Tonopah Vein in which Fantasy–Galaxy, Inc. had a 99% stock interest and Buckeye Oil Co. had a 1% stock interest. Defendant Baskes' law firm was tax counsel to Fantasy–Galaxy and Baskes himself was a trustee and partner in Buckeye Oil. As a result of this transaction, Fantasy–Galaxy claimed a partnership loss on account of prepaid interest of $153,000. Finally, Fantasy–Galaxy was dissolved and all of its assets, including the mining claim, were transferred to Argosy Venture, a Bahamian partnership associated with Castle Trust.

The government presented the case on the theory that the defendant Baskes, Burton W. Kanter, Alan H. Hammerman, and Samuel Zell conspired together to structure the sale of the Towers and the Plaza in such a manner as to disguise and falsify the true tax consequences of the sale to the seller, John E. Cavanaugh, Sr. and family, by falsely treating $700,000 which was really part of the purchase price of the real estate and a part of the Cavanaugh gain, as if it were paid for the mining claim. The claim allegedly was worthless. The government argued that this scheme was carried out by a series of manipulations through the use of corporate entities, corporate stock, foreign trusts, partnerships, backdated documents and ostensible transfers of ownership in order to conceal the true nature of the sale of the Towers and Plaza.

1. The parties disagree as to whether Zeno paid any consideration for the mining claim. It appears that the Cavanaughs assigned to Alan Hammerman, acting as trustee for Zeno, an option to purchase the Plaza for $290,000 cash plus the assumption of $2.4 million of mortgages. It is not clear whether Hammerman paid any consideration for this assignment. Hammerman then reassigned this option to Zell for $700,000. This $700,000 was paid by Zell to Castle Trust and deposited in T–5088 for Zeno's account. In exchange, the mining claim was transferred from T–5088 to Zeno. So, after the unraveling, Zell apparently paid $700,000 to T–5088 for the mining claim, and the mining claim was transferred to the possession of Zeno.

Zell, in April 1970 exercised the option to purchase the Plaza by paying the Cavanaughs $290,000 cash and assuming $2.4 million of mortgages. Earlier, in December of 1969, Zell apparently paid $10,000 cash and assumed $4.9 million in mortgages for the Towers. It appears, therefore, that Zell paid consideration worth approximately $8.4 million in exchange for the Plaza, Towers and mining claim. While it is not clear, it further appears that in 1969 the Cavanaughs sold the land under the Towers and Plaza for $700,000 which was then leased back to the Cavanaughs with an option to purchase. Zell had once offered $9.1 million for the Towers and Plaza.

It is conceded by all parties that the transaction would not have defrauded the government had the mining claim actually been worth $10,000 originally and then appreciated to $700,000.[2] The mining claim was introduced into the transaction, according to the government, because unfavorable tax consequences due to depreciation recapture would have resulted in the Cavanaughs being unable to recover their cash investment had the Towers and the Plaza been sold alone. Moreover, the government argued that a gift of the senior Cavanaughs' portion of the $700,000 was accomplished, without payment of gift taxes.

Defendant Baskes does not challenge the sufficiency of the evidence in this appeal. Rather, defendant contends: (1) the trial court erred in failing to dismiss the indictment or suppress evidence derived from certain illegal government conduct; (2) the government failed to disclose an understanding with two key prosecution witnesses; (3) the trial court erred in refusing to require the government to disclose the scope of its intended cross–examination of defendant's proposed character witnesses; (4) the trial court unduly restricted cross–examination of a key witness; (5) the trial court erred in failing to instruct the jury on the essential elements of the conspiracy charge; and (6) he was denied his right to a fair trial by the admission of substantial evidence outside the charged conspiracy. We affirm.

## II. *Illegally Seized Evidence*

We first note that this court delayed the decision in this case pending a Supreme Court decision in *United States v. Payner.* The Supreme Court recently issued its opinion. 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). At issue in *Payner* was the effect of the government's illegal conduct in seizing certain documents from a briefcase belonging to Michael Wolstencroft, which were introduced at defendant Payner's trial to help convict him. The Court held that Payner lacked standing to suppress the documents under the fourth amendment and "the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court." *Id.* at 735, 100 S.Ct. at 2446.

Here, documents seized at the same time as the documents in *Payner* from the same briefcase allegedly led the government to prosecute defendant Baskes. The Supreme Court's decision in *United States v. Payner* is dispositive of defendant's contention in this case that because of the illegal seizure of evidence the indictment should be dismissed or other action taken to avoid the taint.

**2.** If the mining claim was actually worth $10,-000 at the time of the first exchange and then quickly appreciated in value to $700,000, the transaction would have been a variation of a common estate planning technique used in disposing of an asset which is expected to increase significantly in value. The asset (the mining claim) is transferred to a corporation in return for preferred stock equal to its current value. The common stock of the corporation is issued to the transferor's heirs or to a trust for cash in an amount equal to the value of the common stock. If the contributed asset holds or decreases in value, the transferor is protected, since on liquidation of the corporation he would receive all proceeds up to the stated value of the preferred stock. If, however, the asset increases in value, all the benefits of such increase are realized by the holders of the common stock, since the transferor, as preferred stockholder, would only be entitled to receive the fixed redemption amount of his issued pre-ferred stock. The value added asset is thus effectively removed from the transferor's estate with all growth potential held by his beneficiaries. Further, under the Internal Revenue Code, if the common stockholder were a foreign trust, no tax would be paid by such foreign trust on the sale of that capital asset after liquidation. 26 U.S.C. § 871. Such gain would be taxed only upon distribution to beneficiaries who were United States citizens. 26 U.S.C. § 662(a)(2). Thus, the entire gain could be used by this foreign trust to earn income all of which would not be taxed until the USA distribution.

In this case, however, the value of the mining claim was disputed and the jury could find that it was worthless. In this event, the transaction would no longer be legitimate. It would be only a sham device to hide $700,000 of the price actually received for the real estate and a gift to the younger Cavanaughs.

### III. *Alleged Failure to Disclose Promise of Leniency*

Defendant contends that the government's failure to disclose a promise of leniency made to two key prosecution witnesses in exchange for testimony requires a new trial.

The government's case against defendant Baskes depended extensively on the testimony of John E. Cavanaugh, Jr. and William Thornton. During the direct testimony of both witnesses the government asked whether they had received any promises in exchange for their testimony. Both witnesses replied they had not. In addition, Thornton was asked whether he asked for or received any immunity, to which he again responded that he had not.

Following the jury verdict, at a post–trial hearing held on defendant's motion to suppress certain evidence, the prosecution called Bernard Schoenberg, an attorney representing Cavanaugh, Jr. and Thornton, to testify. On cross–examination Schoenberg testified that he would do everything in his power to prevent a criminal case from being directed at his clients. Schoenberg testified that, although the government told him his clients were not then the target of any investigation and he believed his clients had a complete defense to any fraud charge, he stated to the government that his clients would not furnish any statements or documents to the government until "this matter was resolved civilly in a way which would . . . my clients were willing to pay whatever tax they owed, that I wanted to resolve the matter civilly without penalties and we wanted to be left out and everything else."

Other evidence indicated that the government was not particularly interested in charging Cavanaugh, Jr. or Thornton. One agent thought that there was sufficient evidence to institute a civil fraud case against John Cavanaugh, Sr. and that the institution of civil fraud proceedings against the Cavanaughs was explored. Further evidence was introduced of a phone conversation between an Internal Revenue agent and a Department of Justice attorney in which the attorney stated that he "may" have to give the Cavanaugh group informal immunity. No charges were instituted against Cavanaugh, Jr. or Thornton.

Based on this evidence defendant argues that Cavanaugh, Jr. and Thornton falsely answered that they had never been promised leniency or immunity in return for their testimony and thus they are entitled to a new trial based on *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In *Giglio* the Supreme Court held that a convicted defendant is entitled to a new trial if he can establish that the government failed to correct materially false testimony relevant to the credibility of a key prosecution witness at the trial, including evidence of a promise or agreement concerning a future prosecution between the witness and the government. *Id. See also United States v. Esposito*, 523 F.2d 242, 248 (7th Cir. 1975), *cert. denied*, 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 768 (1976); *United States v. Harris*, 498 F.2d 1164, 1168 (3d Cir.), *cert. denied*, 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1974).

■ In the present case the defendant has not established the required undisclosed agreement of leniency.[3] Defendant has not offered any direct evidence of promises of leniency in exchange for testimony. Instead, defendant asks us to infer promises from Schoenberg's hope that his clients could, if necessary, avoid exposure to criminal or civil fraud proceedings by disclosing what they knew of the transactions. Such a hopeful expectation even when supplemented by evidence that a government at-

---

**3.** In cases in which courts have ordered a new trial based on *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104, an undisclosed agreement of leniency between the government and the witness prior to the testimony was clearly established. *See Giglio*, 405 U.S. at 152–53, 92 S.Ct. at 765; *Campbell v. Reed*, 594 F.2d 4, 7 (4th Cir. 1979); *United States v. Butler*, 567 F.2d 885, 888 (9th Cir. 1978); *United States v. Harris*, 498 F.2d 1164, 1169 (3d Cir.), *cert. denied*, 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1974); *United States v. Gerard*, 491 F.2d 1300, 1304 (9th Cir. 1974).

torney used language concerning the possibility of granting informal immunity is not sufficient to warrant a new trial under the rationale of *Giglio*. *See United States v. Ramirez*, 608 F.2d 1261, 1266–67 (9th Cir. 1979); *United States v. Piet*, 498 F.2d 178, 182 (7th Cir.), *cert. denied*, 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 664 (1974). The situation is too equivocal to deem the witnesses' answers false and the government under a duty to correct or qualify them.

## IV. *Court's Refusal to Require Disclosure of Intended Cross–Examination*

Defendant argues that the district court erred in not compelling the government to disclose the specific instances of defendant's conduct which it intended to use in cross–examination of defense character witnesses, prior to the time they were to testify. As a result, defendant claims he was forced to withhold significant character testimony rather than risk its impeachment by undisclosed and unverified conduct.

We find no rule which mandates such disclosure. This circuit requires the trial judge to consider the truth of the basis for impeaching questions prior to cross–examination of a character witness. *United States v. Jordan*, 454 F.2d 323, 325 (7th Cir. 1971).[4] However, the purpose of the inquiry is to prevent improper questioning which might have a prejudicial impact on the jury and which cannot be adequately cured by instructions. Disclosure is merely ancillary to verification of the conduct to be incorporated in the questions. No rule or rationale guarantees the defense advance knowledge of legitimate impeachment before it calls a witness.

The scope of character testimony is generally left to the discretion of the trial court since it is in the best position to consider the context in which it is to be presented.

[C]ourts of last resort have sought to overcome danger that the true issues will be obscured and confused by investing the trial court with discretion to limit the number of [character] witnesses and to control cross–examination. Both propriety and abuse of hearsay reputation testimony, on both sides, depend on numerous and subtle considerations difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on this subject. [Footnote omitted.]

*Michelson v. United States*, 335 U.S. 469, 480, 69 S.Ct. 213, 220, 93 L.Ed. 168 (1948). Among these considerations are concerns for fairness and efficiency as they emerge from the conduct of the trial. Normally the judge will be free to exercise his discretion in weighing these concerns and deciding when to rule on a specific issue.

█ Accordingly, we find no abuse of discretion in the trial court's refusal to rule on the scope of cross–examination without benefit of having heard the direct testimony. While there may be some advantages to deciding the matter before the witnesses take the stand, there are also compelling reasons for waiting to hear them first. "[U]nless the judge has a grasp of how much ground has been . . . traversed by the offering on good character, he cannot define the ground which the cross–examination may cover in attempting to discredit that testimony." *United States v. Lewis*, 482 F.2d 632, 644 (D.C.Cir.1973). The trial court must decide for itself when it has enough information to make a proper ruling. While the court had much of the information found lacking in *Lewis*, we cannot find it unreasonable in having required more, particularly in light of the absence of prejudice to defendant's right to prior consideration.

---

4. We note that there is some conflict among the circuits on this issue. *Jordan* was decided on the basis of *Gross v. United States*, 394 F.2d 216, 223 (8th Cir. 1968), *on appeal after new trial*, 416 F.2d 1205 (8th Cir. 1969), *cert. denied*, 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 (1970). However, the Eighth Circuit has since drawn into question its holding in *Gross*. *Mullins v. United States*, 487 F.2d 581 (8th Cir. 1973). In *Mullins* the Eighth Circuit found that the propriety of impeaching questions need not be decided "either before trial or before questioning if the matter is satisfactorily resolved during trial." *Id.* at 588.

The defense asked for a ruling on this issue at the close of the government's case. While the court declined to rule at that time, it made it clear that it would fully consider the matter after a witness had testified and before the cross–examination began. Furthermore, it indicated that this consideration would take place outside the hearing of the jury. Given these precautions, the defendant would have been amply protected from the likelihood of improper questioning of his witnesses. The decision by the defense to withhold character testimony was freely made and based on no greater risk than that inherent in all trial proceedings. The defendant is bound by the consequences of that decision.

## V. Restrictions on Cross–Examination

The defendant next claims that the trial court erred in refusing to permit him to ask a question of a key prosecution witness.

Alan Hammerman, an attorney practicing in the same law firm as the defendant, was named in the indictment as a co–conspirator. At the government's request, Hammerman was severed for trial from defendant with the understanding that if Hammerman testified consistently with a prior statement his indictment would be dismissed. Hammerman testified that he worked under defendant's supervision in structuring and implementing the Cavanaugh transaction and he also testified to various aspects of the sales transaction.

On cross–examination defendant's counsel asked Hammerman:

> Mr. Hammerman, did you unlawfully, knowingly and wilfully conspire to defraud the United States together with Sam Zell, Roger Baskes and/or Burton Kanter?
>
> Mr. Hammerman, did you unlawfully, knowingly and wilfully combine and agree together with Roger Baskes, Burton Kanter and Sam Zell to defraud the United States of America?

The trial court sustained the prosecution's objection to these questions. Basing his argument on Rule 704 of the Federal Rules of Evidence and *United States v. Standard Oil Co.*, 316 F.2d 884 (7th Cir. 1963), defendant asserts that such refusal is reversible error.

We find that in prohibiting cross–examination as to the legal implications of what occurred, the trial court did not abuse its discretion. Under Rule 701 of the Federal Rules of Evidence a witness, not testifying as an expert, is limited in testimony in form of opinions and inferences to those opinions which are "helpful to a clear understanding of his testimony or the determination of a fact in issue." Fed.R.Evid. 701(b); *Stoler v. Penn Central Transportation Co.*, 583 F.2d 896, 898–99 (6th Cir. 1978). When, as here, a witness is asked whether the conduct in issue was "unlawful" or "wilful" or whether the defendants "conspired," terms that demand an understanding of the nature and scope of the criminal law, the trial court may properly conclude that any response would not be helpful to the trier of fact. The witness, unfamiliar with the contours of the criminal law, may feel that the legal standard is either higher or lower than it really is. If either event is true the jury may accord too much weight to such a legal conclusion. In addition, in this case the trial court permitted the defendant to extensively cross–examine Hammerman concerning his involvement in the transaction. Defendant does not complain that he was unable to question Hammerman as to any factual matter, only that he could not ask Hammerman about the legal implications of the conduct. The limitation on the cross–examination was not an abuse of discretion.[5] *See Stoler v. Penn Central Transportation Co.*, 583 F.2d at 898–99; 3 Weinstein & Berger, *Wein-*

---

**5.** Defendant relies on *United States v. Standard Oil Co.*, 316 F.2d 884 (7th Cir. 1963), for his claim that the refusal to permit the cross–examination is error. In *Standard Oil*, a price–fixing conspiracy case, this court found that the trial court committed error in not permitting defense witnesses to answer questions as to whether there had been an "agreement," "understanding," "promise," or "commitment," concerning prices. *Id.* at 889–90. Unlike the situation here, those words have well–established lay meanings and do not demand a conclusion as to the legal implications of conduct.

*stein's Evidence,* ¶ 701[02], at 701–13–701–17 (1978).

■ Defendant argues that under Rule 704 of the Federal Rules of Evidence testimony in the form of an opinion is not objectionable because it embraces an ultimate issue in the case and thus the district court erred in limiting cross–examination. Rule 704 abolished the ultimate issue objection, which had prohibited witnesses from expressing opinions upon ultimate issues. The purported purpose of the former rule–to prevent witnesses from "usurping the province of the jury"–had been deemed "empty rhetoric." Advisory Committee's Note on Rule 704 (quoting 7 Wigmore, *Evidence,* § 1920, at 17 (3d ed. 1940)). Rule 704, however, does not provide that witnesses' opinions as to the legal implications of conduct are admissible. *See United States v. Scavo,* 593 F.2d 837, 844 (8th Cir. 1979). The Rule specifically provides that testimony must be "otherwise admissible," and here we have found that the trial court did not abuse its discretion in concluding that the testimony was not otherwise admissible. It is not claimed that there had been any direct testimony which made these questions proper solely as cross–examination.

## VI. *Failure to Tender Conspiracy Instruction*

Defendant next argues that the trial court erred in failing to give the jury adequate instructions on the essential elements of the conspiracy charge. While it is conceded that the court explained what was required for proof of conspiracy, defendant contends he was entitled to an instruction which clearly identified the specific elements as essential to a finding of guilt. Error is premised on the court's inadvertent omission of the precise language of an instruction previously agreed upon by the court and both counsel.[6]

■ It is settled law that jury instructions should be considered in their entirety and not judged in "artificial isolation."

---

**6.** The agreed upon instruction was borrowed from 2 Devitt & Blackmar, *Federal Jury Prac-*

*United States v. Brown,* 518 F.2d 821, 826 (7th Cir.), *cert. denied,* 423 U.S. 917, 96 S.Ct. 225, 46 L.Ed.2d 146 (1975). While the court did not recite the elements of a conspiracy in the agreed upon form, all elements were incorporated in a lengthy discussion of the terms of the indictment and the applicable law. As we noted in *United States v. Barclay,* 560 F.2d 812, 817 (7th Cir. 1977), omission of a formal instruction on a particular element may sometimes be alleviated where the element is fully defined in other terms and its applicability to the case is clear.

The thrust of defendant's argument is that the trial court obscured the elements of the charge by providing such a lengthy explanation and failing to reduce the terms to a simple formula. While a summary instruction may have aided the jury's understanding, we cannot find that they were anything but fully informed of the elements of the charge. The jury was told what constituted a conspiracy and that its various elements must be proven beyond a reasonable doubt. The instructions were not incomplete, nor did they contain misleading information. In view of the parties' agreement the omission was unfortunate, but we are not persuaded that the omission was reversible error.

## VII. *Admission of Evidence of Mining Claim Outside Charged Offense*

The final issue is whether the trial court properly permitted the government to introduce evidence concerning the ownership of the mining claim subsequent to the sale of the claim by the Cavanaughs to Zell. The objected–to–evidence involved the transfer of the claim from Zeno, N. V. to Hornet Mining, Inc. in exchange for stock; the sale of the claim to Tonopah Vein which was 99% owned by Fantasy–Galaxy, a partnership to whom defendant was tax counsel, which sale resulted in a subsequently disallowed $153,000 partnership loss on account of prepaid interest for Fantasy–Galaxy; and the subsequent dissolution of Fantasy–Galaxy and the transfer of its assets to Argosy Venture, a Bahamian part-

---

*tice and Instructions,* § 27.08, at 25–26 (3d ed. West 1977).

nership. Defendant objected to the introduction of this evidence as beyond the scope of the indictment, irrelevant, an attempt by the government to infer additional illegal acts, and evidence of a separate conspiracy which violated the multiple conspiracy rule.

The trial court initially instructed the jury that the Fantasy–Galaxy evidence should only be considered for the purpose of showing the subsequent history of the mining claim. The court also warned that the defendants were only on trial for the acts charged in the indictment. While deliberating, the jury submitted a written question to the judge asking him to clarify his instruction concerning Fantasy–Galaxy. After discussion with the parties, the court added the further instruction that the Fantasy–Galaxy evidence "may be considered by you only to the extent, if at all, you find such subsequent history bears on the intent and purpose of the defendants in the use of . . . this mining claim in the Cavanaugh transaction."

We note that the fact that evidence is offered of events which occurred prior or subsequent to those charged in the indictment does not make the evidence objectionable. *United States v. Fairchild*, 526 F.2d 185, 188–89 (7th Cir. 1975), *cert. denied*, 425 U.S. 942, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976); *United States v. O'Connor*, 433 F.2d 752, 754–55 (1st Cir. 1970), *cert. denied*, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971). Evidence of other events is not admissible, however, "to prove the character of a person in order to show that he acted in conformity therewith." Fed.R.

Evid. 404(b). Such evidence is admissible for other purposes such as proof of intent, knowledge, motive, and preparation. Fed. R.Evid. 404(b). In this case evidence concerning the subsequent ownership of the mining claim was probative of defendant's intent and knowledge.[7]

Intent is an essential element of the crime with which defendant was charged. Baskes' knowledge was also important because one of his defenses was that he relied on Cavanaugh as to valuation of the claim. Both parties have agreed that the value of the mining claim was crucial to the unlawfulness of the transaction. Other evidence at trial was offered to establish that the claim was nearly worthless. Evidence of the subsequent shuffling of the ownership of the worthless claim to different entities, both foreign and domestic, and for different consideration, all pursuant to the counsel of the defendant's law firm, is not only relevant, but persuasive, in demonstrating Baskes' knowledge that the claim was worthless and his intent to use it as an apparently valuable asset to accomplish a tax result.[8]

Defendant further argues, however, that the probative value of this evidence was outweighed by its prejudicial effect and thus it should be excluded under Rule 403 of the Federal Rules of Evidence. He contends that additional illegalities could be inferred from the evidence and that the complicated nature of the transaction might confuse the issue and mislead the jury.

---

7. Defendant Baskes, in his reply brief argues that the subsequent transfers of the mining claim were not substantially similar to the Cavanaugh transaction and thus they were not admissible. The degree of similarity is relevant, however, only insofar as the acts are sufficiently alike to support an inference of criminal intent. *United States v. O'Brien*, 618 F.2d 1234, 1238 (7th Cir. 1980); *United States v. McPartlin*, 595 F.2d 1321, 1343 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). Here, involving as it does the same mining claim and occurring soon after the Cavanaugh sale, the evidence is sufficiently connected to the charged acts.

8. Baskes objects on appeal to the introduction of evidence concerning litigation between Fantasy–Galaxy and the Internal Revenue Service involving the purchase of the mining claim by a partnership, 99% of which was owned by Fantasy–Galaxy. In the purchase Fantasy–Galaxy claimed a $153,000 prepaid interest deduction. As a product of litigation, Fantasy–Galaxy agreed to pay back the $153,000 prepaid interest deduction. Baskes claims Rule 408 of the Federal Rules of Evidence makes such evidence inadmissible. Regardless of the merits of Baskes' argument his failure to object to evidence of the settlement at trial means such objection has been waived. Fed.R.Evid. 103(a)(1).

Under Rule 403 the balancing of probative value and prejudice is committed to the sound discretion of the trial judge and we are obligated to give great deference to the evidentiary ruling of the trial court. *United States v. Watson*, 623 F.2d 1199, at 1203 (7th Cir. 1980); *United States v. O'Brien*, 618 F.2d 1234, 1238–39 (7th Cir. 1980). Examining the record, we do not believe the trial court abused its discretion in admitting the evidence.

The district court told the jury that the evidence of the subsequent history of the mining claim could only be used for the purpose of establishing the defendant's intent. Given the importance of this evidence, its undisputed and proximate character, and the qualification on the purposes for which it was admitted, the trial court did not abuse its discretion in admitting it. *See United States v. Brunson*, 549 F.2d 348, 359–60 (5th Cir. 1977).

Defendant further argues that the admission of the challenged evidence violated "the multiple conspiracy rule of *Kotteakos v. United States*, 328 U.S. 750 [66 S.Ct. 1239, 90 L.Ed. 1557] (1946)." We are at a loss to apply *Kotteakos* to this case.

█ Defendant contends, apparently, that the "other acts" evidence establishes a conspiracy distinct from the one charged. Assuming that is true, the balancing process under Rule 403, is still the test. *Kotteakos* was a case where a single conspiracy was charged, but not proved, although there was evidence of several, related only through a common member. Here the indictment charged one conspiracy and there was evidence tending to prove it. The fact that further evidence relevant to intent may also have proved a distinct and subsequent conspiracy does not change the character of the balancing process under Rule 403.

The judgment appealed from is affirmed.