Robert BREEST

v.

Everett I. PERRIN, Jr., Warden, New Hampshire State Prison.

Civ. No. 79–206–D.

United States District Court, D. New Hampshire.

Nov. 1, 1979.

---

Robert Breest, pro se.

Paul W. Hodes, Asst. Atty. Gen., Concord, N. H., for respondent.

## MEMORANDUM OPINION

DEVINE, Chief Judge.

In this petition for habeas corpus (28 U.S.C. § 2254), Robert Breest contends he has been deprived of due process by reason of alleged acts of prosecutorial misconduct. He also seeks an evidentiary hearing, perceiving that the testimony of certain witnesses is necessary to the proper adjudication of his contentions. The Court, however, has reviewed the extensive record presented, and concludes that such hearing is not required, and that the writ should not issue.

Petitioner was convicted of murder in March of 1973 after trial by jury in Merrimack County Superior Court, and his conviction was upheld on appeal. *State v. Breest*, 116 N.H. 734, 367 A.2d 1320 (1976).[1] In October 1976, he moved for a new trial, and events arising from the consideration of that motion gave birth to the issues presented herein.[2] His motion was denied after hearing, his exceptions thereto were overruled (*State v. Breest*, 118 N.H. 416, 387 A.2d 643 [1978]), and certiorari was denied on June 11, 1979. *Breest v. New Hampshire*, —— U.S. ——, 99 S.Ct. 2864, 61 L.Ed.2d 300.

Two contentions are here advanced by the petitioner. His first claim is that the prosecution failed to disclose exculpatory material favorable to his defense in violation of a court order. The basis of this claim is that the prosecution failed to disclose that David Carita, a key witness at petitioner's trial, had been promised a new name and identity as an inducement to testify. It is further claimed that Carita committed perjury and that the prosecution knowingly allowed such perjury to stand without correction, and in fact emphasized it in the course of trial. Proper resolution of these contentions requires review of the salient portions of the record and the applicable law.

## I. THE RECORD

### A. The Original Trial

David Carita, called as a prosecution witness, testified that he met petitioner when they were fellow inmates in the Billerica, Massachusetts, County Jail (T.T. 754)[3] and that petitioner confessed to him that he had murdered the victim, Susan Randall (T.T. 763). This testimony constituted the only direct evidence presented against the petitioner.[4] In an obvious attempt to bolster the credibility of its witness, the prosecution concluded the direct examination with the following questions:

Q: Were any promises or inducements made to you by myself or anyone else in the State of New Hampshire?

A: No.

Q: To get you on the witness stand this morning?

1. Subsequent attempts at habeas corpus relief on both state (*Breest v. Helgemoe*, 117 N.H. 40, 369 A.2d 612 [1977]) and federal (*Breest v. Helgemoe*, 579 F.2d 95 [1st Cir. 1978]) levels met with equal lack of success.

2. The motion for new trial was initially based on other grounds (failure to disclose the results of a test of certain paint chips) which are not here relevant. A subsequent discovery motion, waived when the witness sought to be deposed actually testified, led to the instant claims.

3. The reference "T.T." is to the original trial transcript.

4. Although the only direct evidence in this case was Carita's testimony against Breest, there was substantial circumstantial evidence supporting the conviction. Witnesses for the prosecution testified that on the night of the murder they saw a young woman fitting the description of the victim hitchhiking in front of a restaurant, and that a car fitting the description of petitioner's stopped to pick her up. Other testimony of witnesses who had been with the victim and petitioner on the night in question placed the two in the same vicinity. Moreover, the prosecution's expert witness testified that tests revealed that the paint chips found on the victim's coat corresponded to the type of paint which petitioner was transporting in his car, and a horsehair found in the petitioner's car agreed with that found in the victim's unusual horsehair coat. This provided, in the estimation of the prosecution's expert, a "rare" double transference of items. In addition, blood (type A, which corresponds to victim's blood type) was found on the passenger seat and on the windshield of petitioner's car.

A: No.

(T.T. p. 767.)

On cross examination defense counsel further probed Carita's reasons for testifying in the Breest trial. Carita explained under oath that at first he had not wanted to testify in New Hampshire because he had a "pretty good deal" in Massachusetts (T.T. p. 801). His change of heart came after talking with Assistant Attorney General Wingate, according to Carita.

A: So I agreed that I would come up, you know. But I wasn't too, you know, happy about it. In fact, I wasn't even sure about it at that time.

Q: You wanted to bargain a bit?

A: No, I didn't think I had to bargain.

Q: You thought they'd take care of you?

A: Well, I explained that if I came to New Hampshire, it would be because I was already released and in Massachusetts. That I didn't want my name in the papers anymore. That I was trying to make a life for myself, and it's rough if they find my whereabouts. It's dangerous to me.

Q: As a result, you had to have something from them, didn't you?

A: Assurance of safety.

Q: And did you make any requirements in this direction? Did you make any requests of them?

A: Did I make any requests?

Q: Yes, sir.

A: Yes, I wanted to be assured that I just wouldn't be thrown in the State's Prison in the population and that who knows who is up here; who knows who may come here. The only people that I knew of that were interested in my safety were the people of Massachusetts.

(T.T. pp. 806–07.)

\* \* \* \* \* \*

Q: So, when you came to New Hampshire, you wanted some sort of assur-

ances that you had something worthwhile here, didn't you?

A: Well, I wanted to make sure that I wasn't giving up what I had in Greenfield to come up here. Like I said before, I didn't want to leave where I was, you know, because of the hard work I put in. I didn't want to come up here, so I asked, 'Well, do you have a work release program up here?' And I was informed that they do. And that along with that I wouldn't be just thrown into the, you know, anywhere just any old prison. I wanted to be assured of my safety. So, if you talk about bargaining or anything like that, yes.

(T.T. pp. 808–09.) Also on cross examination defense counsel elicited the fact that Carita had a history of testifying against criminals, including the chief enforcer of the Mafia, for which a conviction was returned (T.T. p. 775). As a result, many of the prisoners considered him a "rat", according to Carita. In constant fear of his life, Carita had gone so far as to volunteer to stay in "the hole", which is solitary confinement, at Billerica, for five months and seventeen days rather than mingle with the other prisoners in the "cage". Upon his own request Carita was transferred to Greenfield, Massachusetts, among other reasons because he was concerned about his safety, and it was thought that none of the other prisoners there would be familiar with Carita's activities (T.T. p. 804).

## B.  The Motion for New Trial

Following petitioner's trial, David Carita was given the new name and address of "Joseph C. Anthony, Hopkinton Road, Hopkinton, New Hampshire" (Tr. 15, 16).[5] In early September 1975, he was shot and killed in an apparent attempt at robbery, and the report in the news media came to petitioner's attention. The hearing on the petitioner's motion, therefore, focused on his contention that the prosecution's failure

---

5. The reference "Tr." is to the transcript of the hearing on the new trial before the Superior

Court of Merrimack County, September 19, 1977.

to reveal this information was in derogation of his Fourteenth Amendment right to exculpatory information material to his defense; and his claim that he was likewise denied his Sixth Amendment right to fully cross examine the witness.

At hearing, defense counsel called Sheriff Ronald D. Daniels, Jr., who had been instrumental in arranging for Carita's move from Massachusetts to New Hampshire and in providing him with a new name and location. The Sheriff's testimony established that the Attorney General's Office had been directly responsible for providing Carita with a new identity (Tr. 31), but his response was ambiguous as to whether the granting of a new identity to prisoners constitutes standard procedure. In response to a question by Assistant Attorney General Michaud the Sheriff stated that standard procedure was followed "one hundred percent" in regard to witness Carita (Tr. 37), but then on redirect by defense counsel Holland the Sheriff agreed that "statistically, or arithmetically, it would be less likely to get a new name than more likely." [6] (Tr. 38–39.) Upon questioning by the Court, it was also brought out at this hearing that the witness had *not* been promised anything "in the nature of a reduction of his sentence or not prosecuting him for other crimes that he might have been held for." (Tr. 41.)

Following hearing, the trial court made the following "Findings and Rulings on Motion for a New Trial": The State did not disclose to the defendant that it had promised the witness, as an inducement to elicit his testimony, that it would furnish him a new name after the trial; that the State did not violate the court order which did not specifically require a disclosure of promises made to witnesses although it did require disclosure of evidence favorable to the defendant; that "there is no reasonable likelihood that the introduction of evidence

at the trial, relative to the State's promises to give the defendant a new name, could have affected the judgment of the jury as to Carita's credibility, or the judgment of the jury relative to the guilt or innocence of the defendant"; and that "considering Carita's testimony as a whole, it is found that he did not commit perjury in his testimony as to what promises or assurances the State had made to him relative to his safety." See "Findings and Rulings", *State of New Hampshire v. Robert G. Breest*, Merrimack Co. Superior Court, November 8, 1977, p. 5.

*C. Arguments Before the Supreme Court*

In oral argument before the Supreme Court of New Hampshire, the role of the prosecution in the solicitation of or suppression of perjury was explored by Judge Grimes. Assistant Attorney General Michaud downplayed the significance of the promise of a new identity to the witness, arguing that the new identity was given to Carita not as an inducement to testify, but rather to offset the danger of testifying (Tr. 27).[7] Judge Grimes pressed the prosecuting attorney on this point:

> *Hon. Grimes:* He didn't want to come up here?
>
> *Mr. Michaud:* No, Your Honor.
>
> *Hon. Grimes:* So you promised him this change of name and so forth in order to induce him to come up here didn't you?
>
> *Mr. Michaud:* But only to put him back in the status quo.
>
> *Hon. Grimes:* Never mind how. You did it so he would come up?
>
> *Mr. Michaud:* In that sense, Your Honor.
>
> (Tr. 33.)

Judge Grimes then questioned Mr. Michaud on the State's role during the original trial:

> *Hon. Grimes:* Well, wait a minute. Before you leave the direct, though, I

---

6. Petitioner has urged in his brief to this court that an evidentiary hearing would reveal the fallacy of the Sheriff's statement that most prisoners in the prisoner witness program are granted new identities. (Brief of Robert Breest, *pro se*, to the United States District Court for

the District of New Hampshire, July 2, 1979, p. 30.)

7. The reference to "Tr." in this portion of the Opinion refers to the transcript of oral argument before the New Hampshire Supreme Court, April 7, 1978.

have here the last—I guess what is represented to be the last question and answers to him. And this is brought out by the State, and it's false, isn't it?

Mr. Michaud: It's ___ it's ___

Hon. Grimes: It was brought out and asked for the purpose of giving the impression that there was no promise or inducements by anyone whatsoever.

Mr. Michaud: There were none to force him to come to New Hampshire.

Hon. Grimes: Well, he wouldn't—you just said he wouldn't have come.

Mr. Michaud: In the context—literally, Your Honor, the State would agree with you. But in the context of that kind of question, it generally refers to a question of indictment or inducement where he would get something.

Hon. Grimes: Well, no matter what it ordinarily amounts to, in this case the State brought out from him an absolutely false answer; didn't they? They didn't just leave it open. There was no evidence at all, but they specifically asked knowing and expecting he was going to make a false answer.

\* \* \* \* \* \*

Mr. Michaud: It's ___ it's ___

Hon. Grimes: In any event even if they didn't expect it, when they got it, they allowed it to stand.

Mr. Michaud: Yes Your Honor, but the— any file error committed there was corrected by him—by the thorough cross examination by defense counsel on that point, and the fact is that the promise—the assurance of safety was brought out throughout the trial transcript, and it is reasonable to infer that a new name, which Sheriff Daniels testified, is standard practice in the case of protective custody witnesses, is incidental or is part of the promise or assurance of safety.

(Tr. 29–31.)

To summarize the pertinent facts, it is clear that the State promised the key wit-ness a new identity in the event that he testified against the petitioner. This promise was not revealed to defense counsel prior to trial, despite an outstanding court order which required the prosecution to disclose evidence favorable to the petitioner. During the trial, the witness was asked on direct examination by the State if he had received any promises or inducements to testify in New Hampshire, and he answered, categorically, "No". Responding to the same line of inquiry on cross examination, the witness answered that he had been given "assurances of safety", by the State, after which he made reference to the New Hampshire prison system and New Hampshire's work release program, but never specifically mentioned the promise of a new identification or location. The prosecution made no attempt to expand on or to clarify the meaning of "assurance of safety". In fact, in their closing argument before the jury, they specifically disclaimed any possibility that the witness had been induced to testify.[8]

The significant new information brought out in the hearing before the Superior Court and the argument before the Supreme Court was that (1) the Attorney General's Office had been directly responsible for Carita's new identity which included a new name, relocation and altered appearance, (2) that the granting of a new identity is common practice for prisoner-witnesses and (3) the admission by the Assistant Attorney General that at the trial of petitioner Breest the State allowed a false answer to stand.

## II. THE LAW

In reviewing a state court conviction, this court is "limited to searching for constitutional error". 28 U.S.C. § 2254(a); *Grieco v. Meachum*, 533 F.2d 713, 716 (1st Cir. 1976), *cert. denied sub nom., Cassesso v. Meachum*, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976); *Adams v. Sampson*, 588 F.2d 317 (1st Cir. 1978). Yet "[e]ven a constitutional violation will not call for ha-

8. "Now if someone wanted to make a deal, I honestly, believe he's got no deal to be made. He is no better off than when he was down there [in Massachusetts]." (T.T. 1642.)

beas corpus relief where the petitioner was not harmed by the error". *Vitello v. Gaughan*, 544 F.2d 17, 18 (1st Cir. 1976), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977).

> [t]he appropriate inquiry is whether the claimed error of law is 'a fundamental defect which inherently results in a complete miscarriage of justice,' and whether 'it present[s] exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.'

*Davis v. United States*, 417 U.S. 333, 346, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). To aid in its inquiry, "the federal court to which the application is made has the power to receive evidence and try the facts anew", *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); it need not defer to the trial court. Indeed, "a district court is *required* to take additional evidence on a petition for writ of habeas corpus if the allegations establish a *prima facie* case of constitutional error and the relevant facts were not reliably determined by the state court or are incapable of reconstruction from the record." *Lemire v. McCarthy*, 570 F.2d 17, 19 (1st Cir. 1978) (emphasis added). Conversely, it follows that if the petitioner was given a full and fair hearing in the courts below and if the constitutional claim of petitioner cannot be substantiated even after the production of new evidence by petitioner, an evidentiary hearing is unwarranted. Such is the situation in the case at hand, as the following discussion will indicate.

▌ Not every case of nondisclosure constitutes an error of constitutional magnitude. The nondisclosure must be *material*. The standard governing materiality depends on the type of nondisclosure alleged, as set out in the leading case of *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The first category of nondisclosure involves those cases where the defendant makes a general pretrial request to the prosecution for exculpatory material and the prosecution fails to disclose the materiality. Also within this category is the case where no request at all was made. *Cf. Brady v. State of Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In such a case it is a high threshold that a defendant must meet: A prosecutor will not have violated his constitutional duty to disclose unless the information is "obviously exculpatory" and it is "clearly supportive of a claim of innocence." *United States v. Agurs*, 427 U.S. at 107, 96 S.Ct. 2392.

▌ The second situation is where a pretrial request has been made to the defendant for *specific* evidence. Here the standard of materiality is whether "the suppressed evidence might have affected the outcome of the trial". *United States v. Agurs, id.* at 104, 96 S.Ct. 2392.

▌ In the third situation, where the prosecution knowingly uses perjured testimony, the test of materiality is more easily met by the defendant. The conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs, id.* at 103, 96 S.Ct. at 2397, *citing Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1971), and *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The *Napue* and *Giglio* cases, which involved undisclosed promises to government witnesses, make it clear that to bring a case within the above standard, the prosecutor need not have solicited false evidence from a witness, it is enough that the prosecution allows the false testimony to stand uncorrected. *Napue*, 360 U.S. at 269, 79 S.Ct. 1173; *Giglio*, 405 U.S. at 153, 92 S.Ct. 763. *Also see United States v. Sanfilippo*, 564 F.2d 176 (5th Cir. 1978); *United States v. Butler*, 567 F.2d 885 (9th Cir. 1978); *Ray v. Rose*, 371 F.Supp. 277 (D.Tenn.1974). The standard is not weakened merely because the false testimony goes to the credibility of a witness rather than to a substantive issue: "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177.

While some cases in other circuits have seemed to liberalize this third standard somewhat, by requiring a new trial if the undisclosed evidence would merely have "affected the jury's *assessment of the credibility*" of the witness, *United States v. Butler*, 567 F.2d at 885, 891 (emphasis added), the cases in this circuit have steadfastly adhered to the language of *Giglio* requiring a new trial only if the reliability of the witness affected the question of guilt or innocence. *United States v. Gladney*, 563 F.2d 491 (1st Cir. 1977).

■ Petitioner argues that the most stringent *Agurs* standard of nondisclosure applies in this case, since the key witness Carita allegedly committed perjury which was then capitalized on by the prosecution. Whether the government witness in this case did indeed testify falsely is a close question. It is undisputed that the prosecution offered the witness, as an inducement to testify, that it would furnish him with a new identity after the trial. (Findings and Rulings of the Superior Court, p. 3.) And the record reflects that when asked by the prosecutor whether he had been promised anything to testify, the witness answered, "No". However, it could be found that the witness rehabilitated himself on cross examination by admitting, more than a few times, that he had been given "assurances of safety", although failing to disclose the details of this promise. While petitioner urges that the words, "assurance of safety" refer only to safety within the prison population itself and give no notice of the promise of a new identity, the testimony need not be so narrowly construed. In any event, we need not decide the question of whether the trial court was correct in deciding that "considering Carita's testimony *as a whole* it is found that he did not commit perjury in his testimony as to what promises or assurances the State had made to him relative to his safety." Findings and Rulings on Motion for a New Trial, p. 5 (emphasis added), for we find that the ac-

tions of the prosecutor provide a sufficient basis to apply the most stringent *Agurs* standard of materiality. The prosecution, whether knowingly or unwittingly, created the impression that the government's witness Carita had been promised nothing for his testimony. The prosecution had been directly involved in the negotiations to induce the witness to testify in New Hampshire, yet it persisted in highlighting the fact, in direct examination and again in closing argument, that the witness had been promised nothing and was testifying of his own volition.

The State's position is that the witness gained nothing from a new name and identity, that the new identity "merely offset the danger he [the witness] voluntarily placed himself in by coming to the State of New Hampshire to testify against the Defendant in a murder trial", and that "but for his testimony and public exposure he would not have needed assurances of safety" (State's Brief to New Hampshire Supreme Court, p. 14). To accept the statement of the prosecution is to ignore the witness's own testimony about his great fear for his life on account of his previous testimony against Mafia leaders.[9] Certainly a "fresh start" _____ a new name, identity, location, and appearance[10]—would constitute a strong inducement to testify. Yet not only did the prosecution fail to disclose this to defense counsel; it created exactly the opposite impression. For this reason, this case falls within that line of cases where the prosecution knowingly or negligently allowed misleading testimony to stand uncorrected—indeed capitalized on it. Therefore, the correct standard of materiality of the nondisclosure is the strictest *Agurs* standard, *i. e.*, "whether there is any reasonable likelihood that false testimony could have affected the judgment of the jury".

Two recent cases in the Fifth Circuit would appear to support the petitioner's

---

**9.** See T.T. at 802 concerning the witness's voluntary self confinement and his attempt to transfer to a prison where nobody would recognize him.

**10.** See Tr. of hearing in Superior Court, p. 36.

argument that under that standard the prosecutorial misconduct here involved warrants a new trial. The facts of *United States v. Sanfilippo*, 564 F.2d 176 (5th Cir. 1978), are closely aligned with the case at hand. There the Government advised defense counsel in a letter before trial that the Government witness had been promised that he would not be prosecuted in a certain case, that the Government would make the witness's cooperation known to the Court, and that the witness would not be filed against as a second offender. At trial, only one of these promises—informing the Court of the witness's cooperation—was brought out to the jury on cross examination. The Court held that the other promises to the witness constituted cumulative evidence affecting the credibility of the witness which might have affected the jury's judgment. It specifically noted the fact that the prosecution capitalized on the false testimony of a key Government witness by emphasizing in the closing argument that there had been *no promises* made to the witness. "Thus the government not only permitted false testimony of one of its witnesses to go to the jury, but argued it as a relevant matter for the jury to consider." *United States v. Sanfilippo*, 564 F.2d at 179. The Court concluded that the defendant's due process was thereby violated.

In *United States v. Barham*, 595 F.2d 231 (5th Cir. 1979), where the prosecution failed to correct false evidence concerning promises of leniency made to Government witnesses, the Court noted that the involvement of the prosecution in the false testimony was a key factor: The prosecution did not simply allow the false evidence to go uncorrected, but reinforced the deception through his misleading questions. *United States v. Barham, id.* at 239. Even though all of the other evidence in that case would have been enough to support a verdict of guilty (*United States v. Barham, id.* at 242), the Court reversed the conviction and remanded the case for a new trial. In accord with the above cases, *see also, United States v. Harris*, 462 F.2d 1033 (10th Cir. 1972), and *United States v. Butler*, 567 F.2d 885 (9th Cir. 1978).

Three major reasons distinguish this case from the above line of cases, and militate against our deciding that the prosecutorial misconduct herein alleged warrants a new trial. First, in cases such as the above, the prosecution's inducement involved the promise to drop charges, which differs in kind from a promise of a new identity.

■ Second, this court follows, as it must, the decisions of the First Circuit, which apply a twofold test requiring proof to the effect that: (1) there was a promise of aid made by the government to a key witness that was not disclosed to the jury, and (2) that the false testimony could in any reasonable likelihood have affected the judgment of the jury. *United States v. Bynum*, 567 F.2d 1167, 1168–69 (1st Cir. 1978). In *Bynum*, the witness, a co-conspirator, had been promised that any cooperation given to the prosecution would be made known to the Court should he be charged with a crime in connection with the bank robbery involved. On cross examination, he denied having received any promise of leniency from either the FBI or the United States Attorney, answering flatly that "[N]othing has been promised." 567 F.2d at 1169. He subsequently reiterated his earlier denials of receiving any promises, but admitted that in a way his testimony might help him in the future. *Id.*

The facts set forth in *Bynum* are therefore similar to those in the instant case, where on direct examination the witness declared categorically that he was promised nothing for his testimony but he then later admitted on several occasions that he had been given "assurances of safety" by the State. Moreover, in the case at hand, the fact that the prosecution had given the witness some promise for his testimony is made much more explicit than set forth in *Bynum*. However the *Bynum* court held that although "[the witness's] answers would have the effect of misleading [the jury] into believing that the government had provided no promise to induce [the witness] to testify . . . [t]hese responses are far less dramatic in their capacity to

impeach this potential defendant than cases we have reviewed, where either the promise was of far greater importance to the witness, or his response to the cross-examination questions revealed unqualified deception." *Id.* at 1170. The Court concluded that had the promise been disclosed to the jury, it is not likely that the outcome would have been different. *Id.* at 1170. The fact that the Government did not remind defense counsel and the Court of the existence of such promise at the time the witness gave the misleading impression did not, therefore, mandate reversal.[11]

In *United States v. Richman*, 600 F.2d 286 (1st Cir. 1979), defendants appealed a conviction in the United States District Court for the District of Massachusetts of various drug offenses, claiming prejudice from the fact that the assistant United States Attorney failed to inform defendant, albeit negligently, that the Government witnesses were paid informants. At a hearing held by the trial court, the prosecution had explained that the payments being received by the informants were to cover expenses they incurred while acting as undercover agents and were not in exchange for either grand jury testimony or testimony at trial. In fact, the informants had received about $17,000 between them. The court held that "The error by the original government attorney handling the case in failing to provide the above information was regrettable, but, given the circumstances of this case, not so prejudicial as to warrant a dismissal," *United States v. Richman, id.*, at 291.

In *United States v. Ramos Algarin*, 584 F.2d 562 (1st Cir. 1978), the defendant in his appeal from a conviction for immigration fraud alleged that the failure of the Government to disclose a secret understanding between the Government and the witness to dismissal of all, rather than only

three of four, counts—constituted a denial of due process to the defendant and warranted reversal. The Court assumed the worst, that the "deal" *had* existed; and *was* undisclosed, yet in applying the *Giglio* standard and asking whether disclosure could have affected the judgment of the jury on the issue of guilt or innocence, the Court concluded that "the possible prejudice from the improper conduct must be weighed against the effect of the properly admitted evidence" (*citing Morgan v. Hall*, 569 F.2d 1161, 1166 [1st Cir. 1978], *cert. denied*, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1142), and that "even Government misconduct does not warrant reversal if it is harmless", *United States v. Ramos Algarin*, 584 F.2d at 565.[12] Because the witness's credibility had already been subject to close scrutiny "since it was revealed that he had been fired by appellant and had entered a favorable plea agreement which, while not involving dismissal of all charges, did provide for distinct benefits", the Court held that "[w]e are unable to accept the argument that disclosure of an even more favorable agreement between [the witness] and the Government would in any reasonable likelihood have affected the jury's appraisal of appellant's guilt", *id.* at 567. The case at hand provides an even more compelling argument for ruling that the prosecutorial nondisclosure was not prejudicial to petitioner. For, as in the *Ramos Algarin* case, the witness (Carita) alluded to "distinct benefits" accorded him by the Government, and the undisclosed benefit to Carita—a new identity—is not of the same magnitude as the dismissal of all charges. As in the *Ramos Algarin* case, the witness's credibility here had been diminished in other ways as well, including the recital of his criminal record.

In sum, the First Circuit cases which have dealt with prosecutorial nondisclosure of

---

**11.** It should be noted that this case has an "added twist", in that in *Bynum* the Government *had* disclosed the promise to defense counsel well before trial, but neither side used it on cross examination and thus the inducement was not revealed to the jury. Despite this deviation in fact pattern, the case is of

precedential value to this Court in interpreting the *Giglio* standard.

**12.** The Court also noted that "The Government's case against appellant can only be considered overwhelming", *United States v. Ramos Algarin, id.* at 565.

promises to government witnesses have strictly construed the *Giglio* standard. In accordance with that standard, we hold in this case that because the promise herein involved a new identity, it was of less importance to the witness Carita than many prosecutorial inducements. Moreover, because the witness Carita in his testimony alluded to promises by the prosecution, although not in every detail, the testimony by no means reveals "unqualified deception", *see United States v. Bynum*, 567 F.2d at 1170. "Weighed against the weight of the properly admitted evidence,"[13] we conclude that the misleading testimony in this case could not in any reasonable likelihood have affected the judgment of the jury, *Giglio*, 405 U.S. at 154, 92 S.Ct. 763, 31 L.Ed.2d, 104; *Agurs*, 427 U.S. at 103, 96 S.Ct. 2392. Thus, the non-disclosure in this case does not meet the standard of materiality enunciated by the United States Supreme Court, and consequently did not deny the petitioner of due process of law under the Fourteenth Amendment.[14]

Finally, even if a constitutional error could be found under the previous line of cases (which this Court has concluded in the negative), there is an even more compelling reason for denying relief to petitioner. For the case at hand differs from the above-cited cases in that it does not come to this court on direct appeal, but on a writ of habeas corpus. And as noted above, the standard on habeas corpus is much more stringent that on direct appeal. "[E]ven a constitutional violation will not call for habeas corpus relief where the petitioner was not harmed by the error." *Vitello v. Gaughan*, 544 F.2d 17, 18 (1st Cir. 1976), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977).

For the reasons cited above, the claimed error of petitioner, even viewed in the light most favorable to petitioner's case,[15] does

not constitute a "fundamental defect", *Vitello, id.* at 18, warranting the issuance of a writ of habeas corpus.

For the reasons hereinabove set forth, the motion for evidentiary hearing and the petition for habeas corpus must be, and they hereby are, denied.

SO ORDERED.

---

13. *Morgan v. Hall*, 569 F.2d 1161, 1166 (1st Cir. 1978).

14. Since petitioner has failed to meet even the lowest threshold of materiality provided in the *Agurs* case, we need not inquire into the two higher standards.

15. Even if petitioner were to prove at an evidentiary hearing (which is speculative at best from the pleadings) that the key witness received remuneration from Sheriff Ronald Daniels, the result would not be changed in this case.